**STATE v HAHN**

Ohio Common Pleas, Hamilton Co

Decided Nov 28, 1937

Dudley M. Outcalt, Prosecuting Attorney, Cincinnati, and Simon L. Leis, Cincinnati, Carson Hoy, Cincinnati, Loyal S. Martin, Cincinnati, Frank M. Gusweiler, Cincinnati, assistant Prosecuting Attorneys, for the State.

Bolsinger & Hoodin, Cincinnati, Hiram C. Bolsinger, Jr., Cincinnati, Sidney C. Brant. Cincinnati, and Sidney J. Kahn, Cincinnati, for defendant.

See also 25 Abs 258.

**OPINION**

By BELL, J

The indictment in this case charges that the defendant, Anna Marie Hahn, on or about the 3rd day of June, 1937, purposely, and by means of poison killed one Jacob Wagner.

A number of preliminary matters were heard and disposed of, and the cause was tried to a jury. After a protracted hearing the jury returned a verdict finding the defendant guilty as charged in the indictment.

The matter is now before the court upon the defendant's motion for a new trial. Seven grounds are set forth in the motion upon which it is claimed that the defendant is entitled to have the verdict of the jury set aside and a new trial awarded.

For the sake of brevity, the grounds relied upon are as follows:

1. Accident or surprise, which ordinary prudence could not have guarded against.

2. Errors in the admission of evidence.

3. Misconduct of the prosecuting attorney.

4. That the verdict is not sustained by sufficient evidence, and is contrary to law.

5. Error in the charge of the court.

The claims of the defendant will be disposed of in the order here set forth.

On the consideration of this motion the court has re-read the entire record, and a brief statement of the facts will be helpful to a determination of the questions presented.

The defendant is thirty-one years of age. She was born in Fuessen, Germany, and lived there with her parents, five brothers and one sister. During her early womanhood she had an unfortunate experience, which resulted in her becoming the mother of a boy born out of wedlock.

For the purpose, as she states, of giving the boy a better opportunity in new surroundings, about eight years ago she came to America, having received money from an uncle in this city, and she came directly to Cincinnati on her arrival in this

country. She later married one Phillip Hahn, after which she returned to Germany for the purpose of bringing her son to America.

The defendant became acquainted with Jacob Wagner, an elderly German in his late seventies. The evidence is in conflict as to when this acquaintanceship began. The state offered evidence which tended to prove that the two became acquainted about the middle of May, 1937, about three weeks prior to his death. The defendant testified that she had known Wagner since 1935. It is not of great importance when they became acquainted.

The defendant on a number of occasions between the middle of May 1937 and the date of his death on June 3rd, visited the deceased at his residence, which consisted of one room on the third floor of a building located at 1805 Race Street in this city. There was some talk between the defendant and the deceased with regard to money. During the course of their acquaintanceship, between the middle of May and the decedent's death, the decedent's bank book was lost, and he accused the defendant of having stolen it. At the time his book was missing it showed a credit balance in the Fifth Third Union Trust Company in the neighborhood of five thousand dollars. At the time his book was missing he had in his possession two bank books, the property of the defendant, the accredited balance in one of these bank books being in the sum of fifteen or sixteen thousand dollars. After the loss of his bank book had been reported by Wagner to the bank, the defendant went with the deceased to his room, where his bank book was found. After the finding of the deceased's bank book, the evidence discloses that he returned to the defendant the two bank books which he had in his possession belonging to her. Neither of these books was presented by the defendant at the trial.

On Saturday, May 29th, the defendant was seen at the home of the deceased, and on Sunday, the 30th, she reported to some of the neighbors that Jacob Wagner was ill. On that day, in the afternoon, she was again seen in his room and was seen on three different occasions to pour some liquid from a pitcher into a glass and hand it to some one, presumably Wagner.

On Monday the defendant stated that Wagner was better; on Tuesday he was worse and Doctor Cliff was called, by the defendant, who stated to him that she was a niece of Wagner, and she inquired of the doctor whether or not Jacob Wagner was going to die that night. The doctor suggested that Wagner be taken to a hospital, to which the defendant replied that on the next morning they were going to call his own doctor, and then take him to a hospital. Doctor Cliff prescribed some pills which are in common use for diarrhoea.

On the next day Doctor Marnell was called and ordered Wagner taken to the hospital. He saw the patient about two o'clock in the afternoon, in his room, and at that time Wagner looked to him like a man "chronically ill," but the doctor anticipated no danger in his immediate condition.

Wagner was taken to the Good Samaritan Hospital. The doctor saw him again about seven o'clock in the evening, and found him in a very serious and dangerous condition, being practically in a coma at that time.

The defendant went to the hospital with Wagner, and repeated to the authorities at the hospital that she was his niece.

On the same afternoon, after Wagner was taken to the hospital, the defendant returned to his room and told one of the tenants in the building that she (the tenant) could have anything in the room that she desired for herself. The tenant thereupon said to the defendant that was Mr. Wagner's property, whereupon the defendant said: "Go ahead and take what you want; he won't be coming back." That evening she returned to the hospital and remained until about nine o'clock. Wagner grew steadily worse and died about midnight of that day.

Both Doctor Marnell and the interne at the hospital were at a loss to understand the cause of Wagner's death, and the defendant was asked to give her consent to a post mortem examination. At first she refused, but when told that unless she did give consent to a post mortem being performed at the hospital, the matter would be turned over to the coroner of Hamilton County, she gave her consent.

About nine-forty-five on Thursday morning after Wagner's death at midnight, the defendant, already knowing of his death, presented herself at the Fifth Third Bank and there came in contact, talked with and presented to one of the vice presidents, a check for one thousand dollars signed by Jacob Wagner and payable to her. The check was undated, the figures in the blank space on the check, of $1000, were properly filled in, but the "one thousand" was not written in words in the

proper space. The check was written and signed in lead pencil.

The vice president in charge of the transaction at the bank declined to honor the check, and he thereupon properly filled out a check for one thousand dollars payable to the order of the defendant, leaving the signature blank and telling her to take the check to Wagner, whom she said was ill, and have him sign the check as prepared. Some time thereafter she returned to the bank, presented the check which purported to be signed by Jacob Wagner, to the same official, and attempted to open an account in the bank in her name for one thousand dollars, the proceeds of the check.

During the course of the conversation the vice president asked her where Jacob Wagner was, and she answered that he was in the Deaconess Hospital. He thereupon called the hospital by telephone and was told that the man was not there. He then accosted the defendant and told her Wagner was not at the Deaconess Hospital—whereupon she told him she had made a mistake, that he was at the Good Samaritan. He called the Good Samaritan Hospital and ascertained that Wagner had died about midnight the night before. This conversation occurred some time between eleven and twelve o'clock in the forenoon of the day after the death of Wagner. He again confronted the defendant and told her that the hospital had stated that Wagner had died about midnight the night before, whereupon the defendant admitted that she had forged the name of Jacob Wagner to the check for one thousand dollars which the vice president of the bank had prepared when she was there earlier in the morning. On one of these visits to the bank she presented what purported to be a power of attorney signed by Jacob Wagner, authorizing the bank to transfer all of his funds to her.

A post mortem examination was performed at the hospital, which revealed that the throat, stomach and intestinal tract of Jacob Wagner were highly inflamed; it was further disclosed that there were healed spots upon the lungs, and also that the deceased had arteriosclerosis. No chemical examination was made of the viscera of the deceased at that time. The cause of death was given as general arteriosclerosis, and Jacob Wagner was buried.

The day before Wagner was buried the defendant was seen in his room in company with a small, thin man with a small moustache.

As the defendant was returning from the funeral of Jacob Wagner, with two of his neighbors, she stated that she was having bad luck, that she had buried two uncles in the last month.

Several days after the death of Wagner the defendant went to the Probate Court of this county, and accompanied by a deputy of that court went to the room of Wagner, and in that room was found a paper purporting to be a will, by the terms of which all of Waner's property was left to the defendant. The evidence clearly discloses that both the purported power of attorney delivered to the bank, and the purported will were forgeries, and that the defendant forged both instruments.

Early in the month of August the body of Jacob Wagner was exhumed and a second post mortem examination was conducted by the coroner of this county and his assistants, and a portion of the viscera of Jacob Wagner was removed from the body and transmitted to the chemist of the city of Cincinnati for analysis. The analysis showed beyond the peradventure of any doubt that the death of Jacob Wagner was due to the administration of arsenic trioxide. The evidence also disclosed clearly and without contradiction, that there was sufficient arsenic trioxide in the body of Wagner to have killed at least four human beings.

The defendant was arrested on the 10th of August of this year. Following her arrest, and with her full knowledge and consent, she being present in company with the officers, a search was made of the premises in which she lived, located at 2970 Colerain Avenue. Between the rafters in an areaway leading from the first floor of the building to the cellar was found a bottle which contained, at the time it was found, more than seventy grains of arsenic trioxide. At the time the bottle was found the defendant demanded that it be returned to her, became highly excited and repeated her demand upon a number of occasions, although at the trial she denied ownership or knowledge of the bottle.

The pocketbook of the defendant, in her possession at the time of her arrest, was found upon examination to be saturated with arsenic, both the outside cover and the inner lining, and the chemist was able to pick parts of crystals of arsenic trioxide from the accumulated lint in the pocketbook.

As against this evidence offered by the state the jury had for its consideration the denial of the defendant that she at any

time had arsenic in her possession or that she ever administered arsenic trioxide to the deceased.

These are substantially the more important facts with regard to the defendant's connection with the deceased Jacob Wagner.

The evidence further discloses that defendant also became acquainted with another elderly German by name of George Gsellman, who lived in one attic room on the top floor of a building located at 1717 Elm Street. Gsellman had a small bank account, and on or about July 1st he drew from that bank account the sum of one hundred dollars, and on the same day the defendant paid fifty dollars upon a debt which she owed to another person. Gsellman had never drawn at one time from his account such a large sum as one hundred dollars before.

On July 5th the defendant visited George Gsellman in his room, arriving there at about four-thirty in the afternoon and leaving some time in the neighborhood of eight o'clock at night. As she was leaving she preceded George Gsellman downstairs, and he was seen to stagger slowly towards the toilet located on the floor other than that upon which his room was located. On the following morning, July 8th, Gsellman was found dead in bed. At that time, in that room there were cooking utensils with the remains of what was presumably the prior evening's meal, the table was set for two, and also in that room was found a street car pass issued by the Street Railway Company on the date of July 5th for that day only, upon a line which passed the homes of both the defendant and Gsellman, and upon the back of that pass was written in the handwriting of the defendant, "Go home I will be there." In the room was also a slop-jar containing vomitus.

Gsellman's body was held at the morgue without being embalmed, for the period of one month, in an attempt to have some one claim the remains, and at the end of that time was buried, but later on that same day his body was exhumed for the purpose of a post mortem. The post mortem and chemical analysis of this man's body disclosed that he died from a tremendous dose of arsenic. The chemical analysis disclosed that the vomitus found in the room also contained arsenic, and the two pans on the stove, which contained portions of food, showed it to be heavily laden with arsenic.

After her arrest the defendant denied ever having known George Gsellman, but later admitted that that was untrue, that she had known him. In explanation of the street car pass and the writing thereon, she said that Gsellman had owed money to her uncle in the amount of $450 and that her uncle had ordered Gsellman, in the event the money was not paid back before the uncle's death, to pay it to the defendant, and that on July 5th Gsellman called at her home and told her that he was ready to repay the money, but that because she had visitors in the house she wrote on the back of the street car pass, "Go home I will be there," meaning that he was to go home and she would be there some time during the following week. She denied being at Gsellman's home on July 5th.

The evidence further discloses that she became acquainted with another German by the name of George Heis. From him she secured large sums of money to the extent, as he claimed, of two thousand dollars, and by her own admission to the sum of twelve hundred dollars. She prepared food for George Heis, and on each occasion after eating the food she prepared he would become sick, his throat would become dry, he suffered from diarrhoea and pains in the stomach—all of which are symptoms of arsenical poisoning. During her acquaintance with him he became sick, was confined to his bed for a long period of time, and is now a hopeless invalid, suffering from what is known as dropping of the wrists and feet, is unable to walk and must be conveyed in a wheel chair.

Heis' doctor was of the opinion Heis is suffering from arsenical poisoning. The evidence discloses that after Heis became ill and consulted his physician, he accused the defendant of having poisoned him.

Heis was in the coal business. He purchased his coal from The Consolidated Coal and Coke Company and resold it to individuals. During his acquaintance with the defendant and while he was giving her considerable sums of money, he presumably fell in arrears in his payments for the coal. He had a conversation with a man by the name of Osborne, who was an employee of the coal company, and while the conversation is not in evidence, after Osborne had the conversation he called upon the defendant and said to her that Heis had accused her of robbing and poisoning him, and Osborne made arrangements with the defendant to repay the sum of twelve hundred dollars to Heis. The defendant agreed to return that sum of

money, various amounts were paid upon this sum and fifty dollars was paid on the same day that Gsellman drew the one hundred dollars in cash from the bank. The entire debt was not repaid before the arrest of the defendant, although she told the representative of the coal company that she was making a trip out west with some relatives and as soon as she returned she would have the balance of the money.

The evidence further discloses that the defendant became acquainted with Albert J. Palmer, another elderly German, and within a short period of time she got from him two thousand dollars. Palmer visited her home and there ate food; after his visits to her home he also became sick and afflicted with diarrhoea, would complain of burning in his throat and pains in the pit of his stomach, and he likewise, after a short acquaintance, died. He was buried, his body later exhumed, a post mortem was performed, and upon chemical examination of his viscera, it was determined that he also died from arsenical poisoning. The defendant admits the receipt of two thousand dollars from Palmer, but claims that the sum was all repaid, and that most of their money transactions were in connection with race horse gambling.

During the defendant's acquaintance with Palmer, and before his death, she at various times wrote him affectionate letters.

Some time in July the defendant became acquainted with George Obendorfer. Obendorfer was also a man of some small means, and after becoming acquainted with the defendant, he, on July 16th, 1937, withdrew from his bank account the sum of $350. On the same day that he withdrew this amount, the defendant deposited $250 in her bank account to her credit.

On July 21st, Obendorfer, the defendant and her son left Cincinnati for Denver, Colorado. They went from Cincinnati to Chicago, stayed there overnight, and resumed their trip to Denver from that point.

The defendant took certain sandwiches, and during the trip to Chicago some of these sandwiches were given to Obendorfer by the defendant or her son.

On the way from Chicago to Denver, Obendorfer was given more sandwiches, and he became ill on the train, and upon arrival of the party at Denver he was in such condition that he was unable to walk without assistance. The defendant assisting him, they arrived at a hotel in Denver, the defendant registered George Obendorfer, and also registered herself and her son. Obendorfer was quite ill, and was confined to his room during most of their stay in Denver, and the food which he ate was brought to him by the defendant.

The defendant stated to the proprietor of the hotel in Denver that she did not know Obendorfer, but had met him on the train coming from Chicago, that he was sick and she was merely trying to assist him.

During their stay in Denver, on July 24th the defendant went to one of the banks to arrange for the transfer of one thousand dollars of the money of George Obendorfer from a building association in Cincinnati to the Denver bank, stating at that time: "We are going to buy a little farm here in Denver."

While in Denver Obendorfer drank large quantities of water, was sick at his stomach, and suffered from diarrhoea. He grew steadily worse, and the proprietor of the hotel insisted that he be taken to a hospital, or that he would notify the public authorities.

During these few days the evidence discloses the check for a thousand dollars had not arrived. The defendant made several trips to the bank in quest of the same, but she was told that the money could not be received by any one except Obendorfer, and that it would be necessary for him personally to call at the bank, and identify himself and his signature, at which time she told the officials that Obendorfer was out at the edge of the town and unable to get to the bank.

When the hotel proprietor became insistent that Obendorfer be taken to a hospital, the defendant made arrangements to go with him to Colorado Springs, where she claimed he had relatives to whom she had made a promise that she would take him. With the assistance of the defendant and a taxi driver, Obendorfer was taken from the hotel to a railroad station and from Denver the defendant took him to Colorado Springs. Upon their arrival in Colorado Springs, the defendant and her son assisted Obendorfer from the railroad station to the Park Hotel, which was in close proximity. At this hotel the defendant registered Obendorfer, giving his place of residence as Chicago, and also registered herself and her son as being from Chicago, Illinois. She stated at Colorado Springs that she did not know Obendorfer, that she had only met him on the train coming from Chicago, that he was sick and that she was sorry for him and was merely assisting him during his illness. Obendorfer during this illness had never

454

had a doctor, but the defendant was heard to say to her son, "Bring me that bottle of medicine," and later was heard to say that Obendorfer had had his lunch and his medicine and he would be all right. During his stay in Colorado Springs, Obendorfer gave evidence of at least some of the symptoms of arsenical poisoning. Upon the demand of the proprietor of the hotel in Colorado Springs, Obendorfer was taken to the hospital, and the defendant made the statement to several witnesses that she did not know him, or even know his name. He died on August 1st, and when notified of his death the defendant said: "Why tell me about it? I don't know the man." At the time of his death he had no money.

On the day he died, the defendant wrote a letter or a post card, stating that Obendorfer was having a fine time, and was enjoying himself better than he had ever enjoyed himself before.

The thousand dollars which she attempted to have transferred never found its way into the hands of either the defendant or Obendorfer.

The day after Obendorfer died the defendant wrote to some one in Cincinnati that she was having a wonderful time.

Disclaiming all knowledge of Obendorfer, she left Colorado Springs, returned to Denver, went to the same hotel at which they had stopped before, and upon being asked how the old gentleman—meaning Obendorfer—was getting along, she stated that he was doing fine, and was with friends in Colorado Springs.

A post mortem was performed upon the body of Obendorfer, and the viscera was chemically examined and disclosed that he had died of arsenical poisoning.

The defendant returned to Cincinnati early in August, and was arrested on the 10th.

All of these men were elderly single Germans. The defendant's claim is that she did not administer arsenic to any of these men.

This brief resume of the evidence, of course, does not take into consideration all of the evidence that was offered, but does sufficiently state the salient points in the evidence to intelligently dispose of this motion for new trial.

First: The claim of counsel for defendant of accident or suprise which ordinary prudence could not have guarded against. The gist of the argument upon this point is that the defendant was tried for other offenses in addition to the one charged in the indictment, the language used by the defendant's counsel being substantially that she was tried for five separate and distinct offenses. This is an incorrect statement of the situation, for the reason that the record will disclose clearly that she was tried and convicted for the killing of Jacob Wagner, and the fallacy of the argument is clearly demonstrated when we consider for a moment that if the defendant had been found not guilty of the killing of Jacob Wagner the testimony introduced in this case with regard to the other similar offenses would not have been a bar to the trial of the defendant in connection with any one of the other deaths.

The record discloses that the defendant was also indicted for the killing of George Gsellman, and that the state originally elected to try that indictment against her. The defendant knew before the death of Gsellman, Wagner, Palmer or Obendorfer, that George Heis had accused her of administering poison to him. The record discloses that the defendant knew about the Obendorfer transaction, and that her counsel made a trip to Denver and Colorado Springs in the preparation of this case, and talked with practically all of the persons who appeared as witnesses for the state in relation to the Obendorfer matter.

The defendant had knowledge of the Palmer matter, counsel for the defendant having stated early in the trial and before any evidence was introduced, that he knew that the state had disinterred the body of Palmer, and had the organs analyzed, and that no poison had been found.

Prior to the trial, upon motion of the defendant and by consent of the prosecuting attorney, after counsel were unable to agree upon an expert, the court appointed an expert to examine the viscera of Wagner and Gsellman, and report to the court his findings with reference to whether or not those vital organs contained arsenic, and at the conclusion of the state's case the record discloses an order was made permitting the defendant to take any part (less than all) of the viscera of Palmer and Obendorfer, and submit the samples to an expert of their own choosing for the purpose of refuting, if that was possible, the fact that the vital organs of these two men contained arsenic.

In addition to all this, counsel for the defendant had knowledge of §§13444-19, GC, which reads as follows:

"In any criminal case where the defendant's motive, intent, the absence of mistake or accident on his part, or the de-

fendant's scheme, plan or system in doing an act, is material, any like acts or other acts of the defendant which may tend to show his motive, intent, the absence of mistake or accident on his part, or the defendant's scheme, plan or system in doing the act in question, may be proved, whether they are contemporaneous with, or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another or subsequent crime by the defendant."

It was claimed during the trial before the evidence was admitted as to other similar offenses, that this section of the statute was unconstitutional. Nothing has been said that would in any way change the opinion of the court (9 O.O. 449) expressed at that time, except that this evidence having been received shows that in each and every one of these transactions the object and the motive for the act was the obtaining of money for herself by the defendant, and in the opinion of the court clearly shows a connection between all of them in the mind of defendant. The court did not pass upon the constitutionality of the section at the time it was presented, but concurs with the ruling found in 16 Abs 226, and 132 Oh St 78, 7 O.O. 198, that the section is constitutional. This statute in my opinion being a mere statute of procedure, no defendant has any vested or constitutional right therein. See: Beazell v Ohio, Chatfield v Ohio, 269 U. S. 167; Beazell v State, 112 Oh St 838; Chatfield v State, 112 Oh St 839.

The defendant in a criminal action is not entitled to be apprised in advance, either by the indictment or by notice by the state, of the intention to introduce evidence of other offenses under §13444-19 GC; however, in this case the defendant was apprised of the fact that the state intended to introduce evidence of other similar offenses.

Upon this state of facts the claim that the defendant was taken by surprise cannot be maintained.

Second: Error in admission of evidence.

Counsel strenuously contended that the admission of evidence of similar offenses was erroneous and prejudicial. Sufficient has been said upon that proposition both at the time the evidence was admitted and heretofore in this opinion.

Counsel objected to the admission of many documents upon the ground that

opportunity had not been given to defendant to inspect and make copies of them.

A motion was filed before trial, for an order to compel the prosecuting attorney to exhibit to defendant and permit her counsel to inspect and make copies of all documents in his possession or under his control which he expected to offer in evidence at the trial.

Although the motion was overruled upon another ground, the court expressed the view that §11552 GC had no application to a criminal case.

In Yeeman v State, 112 Oh St 214, the Supreme Court held that §11552 GC was not applicable to criminal cases, and that the trial court had no authority to make an order granting the right to inspect and make copy of any document in the hands of the prosecuting attorney until it was admitted as evidence on the trial.

Counsel claim that error was committed in permitting two chemists to give opinion evidence as to what constituted a lethal dose of arsenic, the claim being that chemists are not qualified to testify upon that subject.

There is no Ohio case in which this exact point is decided, but it is universally recognized that the examination to determine poison in the human body is work for expert chemists. In Lucas on Forensic Chemistry, it is said: "This is work for the expert only, and should never be undertaken except by those having special experience."

The cases are uniform in holding that a chemist may testify as to the physiological action of poison.

To hold that a chemist could examine the organs of the human body and testify as to the quantity of poison therein contained, but could not testify as to the necessary quantity of such poison to produce death, would be to reduce the law to the point of absurdity.

In addition to the testimony of the two chemists on this subject, there is testimony of two physician toxicologists, and the opinion of all four witness are substantially the same.

It is claimed that error was committed in connection with two salt shakers. With reference to that subject the record discloses this situation:

The bag which George Obendorfer had when he left Cincinnati and when he arrived at Denver in company with the defendant, was found about two weeks after

his death, checked at the station of the Denver & Rio Grande Railroad at Colorado Springs, Colorado.

The contents of that bag at that time consisted of two sale shakers; one was empty, the other practically full. On the statement by the prosecuting attorney that they would be properly connected, the state was permitted to show that upon chemical analysis the full shaker contained 82 per cent arsenic, 14 per cent common salt and 4 per cent dirt and other impurities. There was no testimony as to when the bag was checked or by whom. No connection was established between these shakers and the defendant except the fact that after Obendorfer's death she had said she was going to check her baggage at same railroad station where this bag was found.

Thereupon all the evidence as to the contents of the shakers was stricken from the record, the jury instructed to disregard it, and the court refused to admit the shakers in evidence.

If this was an erroneous ruling, the error was against the state and in favor of the defendant.

The state claimed that George Obendorfer came to his death by means of arsenical poison and had a right to offer any evidence which tended to prove that fact; no one would be so bold as to assert that the finding of arsenic in his bag did not tend to prove that fact; however, the Obendorfer death being introduced as a similar offense, and the state not being under the burden of proving that offense beyond a reasonable doubt, and the proof failing to show the defendant in possession of the shakers, the court arrived at the conclusion that the jury might draw some improper inference against the defendant and refused them as evidence; had the state been trying the defendant for the killing of George Obendorfer, upon the present state of the record they would have been admitted in evidence.

Third: Misconduct of the prosecuting attorney.

It is claimed that the prosecuting attorney was guilty of misconduct in attempting to introduce evidence as to two bottles claimed to have been found in the private toilet of Jacob Wagner shortly after his death; there is also a claim of misconduct of the prosecutor in his argument to the jury.

With reference to the two bottles, the record discloses this situation:

The state called as a witness one Mattie Monroe, who testified that Jacob Wagner had a private toilet for his exclusive use in the building in which he lived, and that it was secured by a lock; that shortly before his death she saw the defendant enter that toilet; that several days after Wagner's death she, the witness, entered the toilet. She was then asked the following question (record page 319):

"Now Mrs. Monroe, will you tell this jury what you found in this toilet when you went in there?"

Objection; overruled; exception.

"I found a small bottle containing arsenic and one containing strychnine and a doctor's needle."

Thereupon counsel for defendant moved the jury be discharged, which motion was overruled.

Counsel then moved that that part of the answer wherein the witness stated the contents of the bottles be stricken from the record, which motion was granted.

The prosecutor then asked the witness whether the bottles were labeled and attempted to have her state what was on the labels; to those questions objections were sustained.

The prosecutor then asked the witness the appearance of the contents of the bottles and further developed that the witness had thrown the contents of the bottles into the toilet and destroyed the bottles.

Thereupon, upon motion of the defendant, the court struck from the record and from the consideration of the jury, all of the testimony with reference to the bottles; to have any probative value it would require that the jury first draw the inference that defendant had placed the bottles in the toilet, and upon that inference draw a second inference that the bottles contained poison, violating the rule laid down in **Sobolovitz v Oil Co., 107 Oh St 204.**

The question here presented, however, is whether or not the attempt to offer this evidence was misconduct. The prosecuting attorney maintained that this evidence was competent, the defendant that it was not.

It is not misconduct to offer, in good faith, evidence of doubtful competency, for in no other way can its competency be determined. There is no claim that the prosecuting attorney was not proceeding in entire good faith. See: Clark v State, 156 NE 219; **Andrews v State, 15 O.C C. (N.S.)** 241; Machatewe v Dusha, 164 NE 783; **Holsman v Heaton, 5 Abs 679.**

In the closing argument, the prosecuting attorney used this language:

"Ladies and gentlemen, in the four corners of this court room there stand four dead men—Gsellman, Palmer, Wagner, Obendorfer, and from the four corners of this room bony fingers point at her and they say to you,.'That woman poisoned me! That woman made my last moments an agony! That woman tortured me with the tortures of the damned! And then turning to you they say: 'Let my death be not entirely in vain. My life can not be brought back, but through my death and the punishment to be inflicted upon her you can prevent such a death coming to another old man'. From the four corners of this room those old men say to you, 'Do your duty'!"

No objection was made to this argument at the time it was made, nor until the motion for new trial.

The record will disclose that counsel for both sides in their argument at times went beyond the evidence, and the reasonable inferences to be drawn from it, and in the final argument to the jury on behalf of the defendant, counsel stated as a fact that the deaths of Obendorfer, Palmer and Gsellman had nothing to do with the case on trial. and made various other statements outside of the record.

The record does disclose that Palmer, Wagner, Gsellman and Obendorfer are dead, and that each came to his death by means of arsenical poisoning, and the testimony further discloses that at least two of these men did die in agony.

The nearest approach to the argument here complained of that the court has been able to find, was made by the District Attorney in the case of United States v Chadwick, on error reported in 15 O.F.D. 615. The argument complained of is found on pages 641-2-3 of the record of the case. Part of the argument was objected to at the time it was made, and part of it was not objected to until motion for new trial. What was said there in disposing of the matter. can well be adopted here. The learned Judge Lurton, who wrote the opinion in that case, and who later became a judge of the Supreme Court of the United States said:

"But we do not understand it to be the province of a court to limit the arguments of counsel when they are based upon any evidence in the case. There is a degree of liberty allowable to counsel, whether for the government or the accused, in respect to the line of argument they shall pursue, and the inferences to be drawn from the evidence which a trial judge should respect until the facts of the case are overstepped or arguments used which plainly abuse the privilege.

"If every remark made by counsel outside of the testimony were ground for reversal, comparatively few verdicts would stand, since in the ardor of advocacy and in the excitement of trial even the most experienced of counsel are carried away by this temptation.

"Nothing is better settled than that the defendant who deems himself prejudiced by the language of counsel should promptly and publicly object and point out the language deemed improper, and then take exception if the trial judge fails to condemn it. It is too late to predicate error upon the refusal of the trial judge to grant a new trial on account of a complaint made only after verdict and upon a motion for new trial."

The objection, even if well grounded, comes too late.

Fourth: That the verdict is not sustained by sufficient evidence, and is contrary to law.

In the opinion of the court, the evidence was so overwhelming that no verdict other than guilty could have been reached by the jury. The verdict is not contrary to law.

Fifth: Error in the charge of the court.

The error complained of is that the court did not define motive. On this subject, the court said:

"It is claimed by the state that the motive of the defendant in doing the act charged against her was to acquire for herself the property of Jacob Wagner. While motive is not an essential element of the crime charged, the state always has the right to prove a motive for the act, and a failure to prove motive for the doing of the act may be considered by the jury in determining the guilt or innocence of the accused."

The word "motive" is one of common use and is generally understood; the court has found no authority for the proposition that it must be specifically defined, but

even though defendant's contention be correct, the objection comes too late.

At the conclusion of the charge, the court asked counsel this question: "Is there anything further for the defendant?" Counsel thereupon made several requests of the court, but did not mention or request that anything further be charged upon the subject of motive.

It is well established that counsel cannot complain as to any failure to charge when, after having been given the opportunity, he makes no request of the court. If counsel considers the instructions insufficient, desires more specific or comprehensive instructions or desires the court to elaborate upon or explain instructions given in its general charge, he must call the court's attention to the fact and request that the instructions given be elaborated or amplified. See: **Columbus R. Co. v Ritter, 67 Oh St 53; Spitz v Spitz, 5 Abs 531; State v Schiller, 70 Oh St 1.**

The court has considered this motion in the light of §13449-5, GC, reading as follows:

"No motion for a new trial shall be granted or verdict set aside, nor shall any judgment of conviction be reversed in any court in case of any inaccuracy or imperfection in the indictment, information or warrant, provided that the charge be sufficient to fairly and reasonably inform the accused of the nature and cause of the accusation against him; nor for any variance between the allegations and the proof thereof unless the accused is mislead or prejudiced thereby; nor for the admission or rejection of any evidence offered against or for the accused unless it affirmatively appears on the record that the accused was or may have been prejudiced thereby; nor for any misdirection of the jury unless the accused was or may have been prejudiced thereby; nor for any other cause whatsoever unless it shall affirmatively appear from the record that the accused was prejudiced thereby or was prevented from having a fair trial."

Being of the opinion that no substantial or prejudicial error affirmatively appears in this record which discloses that the accused was prejudiced or was prevented from having a fair trial, the motion for new trial should be, and hereby is overruled.