## STATE v HAHN

Ohio Appeals, 1st Dist, Hamilton Co

No 5388. Decided Feb 7, 1938

Dudley M. Outcalt, Cincinnati. Simon L. Leis, Cincinnati, S. Martin, Cincinnati, Carson Hoy, Cincinnati, for appellee.

Bolsinger & Hoodin, Cincinnati, for appellant.

## OPINION

By ROSS, PJ.

Appeal on questions of law from the Court of Common Pleas of Hamilton county, Ohio.

The defendant was convicted and sentenced in and by such court for the crime of murder in the first degree. The jury did not recommend mercy.

The indictment charged that the defendant unlawfully caused the death of Jacob Wagner by the administration of poison on or about the 3rd day of June, 1937.

Counsel for the defendant insist that the defendant was not given a fair trial, and that prejudicial error has intervened. In their brief, the several assignments of error have not been separated. From a consideration of the briefs presented to us we have identified five specific charges of error, as hereinafter noted.

1. Complaint is made that the request of the defendant for a bill of particulars was, in effect, denied.

Sec 10 of Art I of the Constitution of Ohio, among other things, provides that the accused shall have the right "to demand the nature and cause of the accusation against him and to have a copy thereof."

Sec 13437-6 GC, sets out certain forms suggested for use in framing of indictment and concludes with the provision:

"Provided, that the prosecuting attorney, if seasonably requested by the defendant, or upon order of the court, shall furnish a bill of particulars setting up specifically the nature of the offense charged."

The state, upon being requested to furnish a bill of particulars, gave the defendant a Bill and Supplemental Bill of Particulars, which advised the defendant that the evidence would disclose that the type

of poison administered Jacob Wagner was arsenic, and that such poison was administered through the mouth.

The defendant was thus informed by the indictment and bills of particulars that she was charged with the unlawful administration of arsenic, a poison, to Jacob Wagner, by giving it to him through the mouth, and that she caused his death thereby on or about the 3rd day of June, 1937 in Hamilton county, Ohio.

We consider that the defendant was sufficiently informed of the nature of the specific crime charged. The prosecuting attorney is not bound to furnish specifications of evidence, upon which he intends to rely for a conviction.

It is asserted that the request of the defendant was not granted by reason of the failure to name other persons whose deaths were caused by the defendant, and evidence of which was produced at the trial. Such evidence had its proper place in the trial, as will later appear.

In this connection, the defendant also claims surprise, and that she had no opportunity to properly prepare her defense, in that evidence was introduced showing the commission of other similar offenses, because the intention of the prosecutor to introduce such evidence was not indicated in the bill of particulars.

Upon this phase of the matter the record shows that counsel for the defendant were well aware for a considerable period before trial of the general character of the evidence which might be introduced to establish motive or identity of the accused as the perpetrator of the offenses charged.

In the cross-examination of witnesses conversations with counsel for defendant were alluded to indicating a considerable investigation by them of the incidents furnishing the subject of the evidence objected to. The opening statement of the prosecutor was questioned in a manner also indicating familiarity with the nature of such evidence.

It may be that counsel for the defendant in considering such evidence available to the prosecutor, and with which such defense counsel were familiar, deemed all or a portion of it inadmissible and were surprised at the ruling of the court permitting its introduction. Such surprise cannot form the basis of prejudicial error. If the court committed error in its action upon the objection to such evidence, this would be an entirely different matter, wholly separate and distinct from any element of surprise.

II. Certain misconduct of the prosecuting attorney at the trial and during argument is charged.

An examination of this record causes us to conclude that no improper act of the prosecutor, to which objection was seasonably made, was permitted without appropriate action of the trial judge, divesting such act of the power to produce error, prejudicial to the defendant.

III. The defendant assigns as error also the failure of the trial judge to submit to the jury other inferior offenses usually included in the crime of murder in the first degree. While the evidence in a case based upon an indictment charging malice and premeditation in the perpetration of murder might require charges upon such included offenses, there is nothing in the record indicating that a charge upon any other offense than that presented to the jury would have been proper in the instant case.

We also find no impropriety in the instructions given the jury and criticized by the defendant.

IV. It is asserted that the verdict is not sustained by the required degree of proof.

Upon this assignment, we find against the defendant. Our reasons for so concluding will be more apparent in comment upon another assignment of error involving the admission of evidence of other similar offenses.

V. Counsel for defendant at the trial, by objection, in their arguments and briefs upon the motion for a new trial, and in this court have consistently claimed that the admission of evidence, substantially the participation of the defendant in the deaths of three other men by the administration of poison, was inadmissible, and constituted prejudicial error. If such evidence was inadmissible, it was unquestionably prejudicial to the case of the defendant.

It is asserted that the section of the statutes under which such evidence was admitted is unconstitutional if applied to permit the introduction of this evidence in this case.

Sec 13444-19 GC, provides:

"In any criminal case where the defendant's motive, intent, the absence of mistake or accident on his part, or the defendant's scheme, plan or system in doing an act, is material, any like acts or other acts of the defendant which may tend to show his

motive, intent, the absence of mistake or accident on his part, or the defendant's scheme, plan or system in doing the act in question, may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another or subsequent crime by the defendant."

In the case of **Russo v State of Ohio, 126 Oh St 114,** the Supreme Court held that this section of the statutes is merely declaratory of the common law. See page 117 of the opinion.

We find nothing in the constitution of either the State of Ohio or the United States which abrogates or ▌ limits this rule of common law incorporated in the statutes.

It only remains, therefore, to determine whether the evidence admitted comes within the purview of the section incorporating such rule of procedure. This necessitates a statement of the evidence showing the connection of the offenses proved with the offense made the subject of the indictment. We are not here called on to pass upon the admission of evidence establishing the existence of offenses similar to that upon which an indictment is grounded, but wholly unconnected therewith. We are required, however, to determine whether or not the evidence objected to is probative of motive, intent, the absence of mistake or accident on the part of the defendant, or whether such evidence developed a scheme or plan upon the part of the defendant which involved not only the taking of the life of Jacob Wagner, but also involved the several acts of the defendant incident to the deaths of other men.

It is also essential that we ascertain whether or not such evidence was necessary to prove an element in the case of the prosecution.

A review of the record causes us to conclude that the evidence, to which objection is made, was clearly relevant ▌ to an element of the case of the state, came within the purview of the statute, and disclosed a chain of events, each of which was a necessary link in a plan or scheme on the part of the defendant to dupe or defraud single, old men, living alone, by cajolery, flattery, and affectionate attention for the purpose of securing their money and property.

We now proceed to recount only so much of the evidence as may, in our opinion, be necessary to justify this conclusion.

About one year previous to the death of Jacob Wagner, that is, in June, 1936, the defendant became acquainted with George Heis. Through fraud and misrepresentation, she secured from Heis a considerable sum of money. A part of this total sum, which the defendant so secured from Heis, was owing to a corporation with which he was connected. There was convincing evidence that after the defendant had secured all the money Heis had available, she administered poison to him in food prepared for him by her. Being pressed for payment by his company, he disclosed to a representative of the company his condition and evidently the fact also, judging by the action of the representative, the connection of the defendant both with the loss of his money and the state of his health. He was in a badly crippled condition when he testified against the defendant at her trial, and, again, in open court, charged her with having attempted to poison him. It is worthy of comment that the defendant was by Heis charged with the administration of poison and the medical testimony substantiates the administration of arsenic a considerable time before the immediate incidents leading up to her arrest and trial. Osborne, the Company's representative, transferred his efforts to secure repayment of the Company funds from Heis to the defendant, from whom he demanded immediate settlement and from whom he obtained a promise to pay the sum of $1200.00, the amount claimed due the company. Osborne also told the defendant that Heis claimed she had poisoned him.

Osborne continued a relentless pressure upon the defendant for payment.

She then contacted a man by the name of Albert Palmer, whom by some means she induced to give her money at various times amounting to $2000.00. Out of this sum, she paid Osborne $900.00 on account of the Heis claim. This occurred in the latter part of the year 1936.

Palmer died in March, 1937, when his savings were exhausted. Letters indicating a marked affection between Palmer and the defendant are in the record. The evidence showed that the deceased had frequently partaken of food, prepared and produced by the defendant. An examination of his exhumed body caused experts to state the probability was that he had died from arsenical poison.

Osborne secured the services of one

Ernest Thomas to assist in collecting the remaining $300.00 of the Heis claim. Checks were given by the defendant at various times as part payment upon this demand, and were returned with a statement "insufficient funds". A threat of prosecution for the Heis fraud and poisoning was constantly kept before the defendant.

On the first day of May, the defendant gave these men a check for $300.00, dated June 1st, 1937, and shortly thereafter made the acquaintance of Jacob Wagner, the man whose death formed the basis of the instant prosecution.

The record shows that after a systematic search of a building in which Wagner lived, the defendant located his room and became his more or less constant companion. The evidence is convincing that there had been no previous reason for their introduction, although the defendant attempted to account for same. During the month of May, 1937, she improved the first acquaintance by frequent visits to his room. She held herself out as his niece. Shortly before Wagner's death he charged the defendant with having taken his bank books, and later withdrew the charge upon finding the books in his room. This was on Saturday the 29th of May, 1937. The defendant was seen in the afternoon of the following day (Sunday) to give a person in Wagner's room a liquid from a glass poured out of a pitcher. The defendant told neighbors that Wagner was ill Sunday. On Monday, she stated he was improved, and on Tuesday, the 2nd of June, that he was worse. Physicians were called by the defendant and he was sent to the hospital on Wednesday, June 3rd. He was seen by a physician at two o'clock in the afternoon, and was, in the opinion of such physician, at that time merely chronically ill. At seven, P. M., that evening, he was in a coma, and died at twelve midnight. On Tuesday, when the doctor was first called, the defendant asked him if Wagner was going to live through the night. Wagner at that time was not apparently so critically ill as to reasonably warrant the question.

After Wagner had been taken to the hospital on Wednesday, the defendant, who posed as Wagner's niece, told one of his neighbors to "Go ahead and take what you want—he won't be coming back," indicating the effects of Wagner in his room.

The defendant was at the hospital at eight o'clock Thursday morning. The authorities requested a post mortem. The defendant refused permission. The author-

ities threatened to turn the matter over to the coroner, whereupon defendant consented. No analysis was made of the viscera at this time, and the cause of death was attributed to natural causes. An exhumation of the body later permitted such analysis, disclosing the presence of arsenic in the viscera in lethal quantities.

At 9:45 Thursday, only a few hours after Wagner's death, the defendant endeavored to secure credit upon a forged check with Wagner's bank. She first presented a check written in pencil, with figures only designating the amount. At the same time she presented a note from Wagner ordering payment of check and the balance of his account transferred to her name. The note was a forgery. The bank stated that the check was too irregular in form to pay and directed the defendant to secure Wagner's signature to one prepared by the bank. She later returned with this check containing the forged signature of Wagner. The bank officials called the hospital, where she claimed Wagner lay and were told he was not there. She then corrected an alleged mistake in the name of the hospital, and upon the second hospital being called, Wagner's death was discovered and the defendant threatened with prosecution. She asked for mercy and was permitted to leave unmolested.

On the afternoon of the same day the defendant was seen in the company of an unidentified man in Wagner's room.

The following morning she applied to the Probate Court for a deputy, and in his company inspected Wagner's room, where a paper writing purporting to give the defendant the property of the deceased was discovered. It was not in form effective as a will. It was shown to be a forgery of the defendant.

Osborne had put the check dated June the first, 1937 through bank. It was returned marked "insufficient funds". Pressure again was brought to bear upon the defendant for payment of the balance of the Heis account.

About this time, she contacted a George Gsellman, who lived only a short distance from the home of Wagner. On July 1st, he withdrew from his bank account $100.00 and on the same day, the defendant paid Osborne $50.00. Gsellman had never before withdrawn such a large sum of money. He was found dead in his room on the morning of July 6th. Witnesses testified that the defendant was with the deceased the night before his death. Arsenic was found in the remains of food in his room and in vomi-

tus in a slop jar. His exhumed body was found to contain lethal quantities of arsenic. A street car pass upon a line of cars passing both the home of defendant and Gsellman was found in his room, containing the words "Go home I'll be there" in the handwriting of the defendant. The defendant at first denied knowing Gsellman, but later admitted acquaintance with him.

Osborne and Thomas still pressed the defendant for the payment of the $250.00, remaining due on the Heis account.

Shortly after the death of Gsellman, defendant became acquainted with George Obendorfer, and about the middle of July she arranged to go to Colorado with him. He withdrew $350.00 from his account, and the same day the defendant deposited $250.00 in her account. Obendorfer became sick on the train after eating sandwiches prepared by the defendant. At the hotel in Denver, where the defendant and Obendorfer stopped, he became steadily worse and was taken to Colorado Springs, when the manager of the Hotel in Denver insisted that Obendorfer be taken to a hospital.

During her stay in Denver, the defendant attempted to secure a transfer of $1000.00 from Obendorfer's account in a Building Association in Cincinnati into the credit of herself in the Denver bank. She permitted various persons to consider her a chance train acquaintance of Obendorfer or a relative as the occasion in her opinion demanded.

Upon arrival at Colorado Springs and stopping at a hotel, the management insisted upon the removal of Obendorfer to a hospital, where he died within a few days. His exhumed viscera showed death due to arsenical poisoning.

Upon defendant's return to Denver, she told the manager of the hotel where Obendorfer had stopped that Obendorfer was in Colorado Springs and was doing nicely.

Shortly after the return of the defendant to Cincinnati she was arrested. A search of her residence disclosed a bottle containing 77 grains of arsenic trioxide. Arsenic was also found in the purse carried by her when arrested.

The trial court excluded evidence of the existence of a salt cellar containing arsenic found in the valise of Obendorfer.

All of these men who were poisoned were of a specific type. They were all well along in years, were single, lived alone, and were of German descent, as was the defendant.

There was an attempt in each case to de- fraud and dupe and to secure money after a friendly interest had been developed.

They all partook of food prepared by the defendant, who was seen in their company shortly before the effects of the poison was manifest.

Heis, the living victim, charges the defendant with poisoning him. In each case the poison was arsenic.

We have not been able here to give in detail the many circumstances which with those here related develop a continuity of purpose and design rendering each successive crime the direct result of its predecessor. For a more complete statement of facts and a discussion of law applicable, we refer to the opinions of Bell, J., who presided at the trial of the defendant. In these opinions, the court ably recited the facts and commented upon the law. **State v Hahn, 9 OO 449; (25 Abs 258); State v Hahn, 10 O O 29, (25 Abs 449.)**

We find that the defendant had a fair trial and that no error has intervened to her prejudice.

Our conclusion is that the judgment is affirmed.

HAMILTON & MATTHEWS, JJ, concur.